R SUS AN M. CHEHARDY, Judge.
Plaintiff appeals the dismissal of its suit for breach of contract. We affirm, for the reasons that follow.
FACTS
Professional Dental Health Network, Inc. (“PDHN”) is a corporation formed primarily to engage in the business of providing discounted referral dental plans to members of health maintenance organizations, employer groups, trade groups and individuals. Advantage Health Plan, Inc. (“AHP”) is a health maintenance organization (“HMO”) that entered into three contracts (“the Agreements”) with PDHN for a term of one year beginning September 1, 1996 to provide discounted referral plans for dental, hearing and vision care (“the DVH Rider”) to AHP’s members.
The Agreements provided that AHP would pay the PDHN a monthly fee for members to access the referral plans. A dispute arose between the parties as to the number of AHP members covered by the Agreements. PDHN asserted the Agreements covered all members of AHP. AHP contended the Agreements | ?,required it to pay access fees only for those members who chose to include the DVH Rider in their insurance plan renewals. Thus, AHP was paying access fees to PDHN for only a portion of its members, but PDHN contended that AHP was required by the Agreements to pay access fees for all members of AHP.
On September 1, 1997 the Agreements were renewed for another year by operation of an automatic renewal clause. On September 9, 1997 AHP notified PDHN in writing that effective September 1, 1997 it would discontinue offering PDHN’s networks to its groups. Accordingly, on September 9, 1997 PDHN advised AHP in writing that AHP had breached the Agreements “by not providing its group members access” to PDHN’s networks. PDHN warned AHP that this was “in clear breach” of the Agreements.
On November 20, 1997 PDHN filed suit against AHP for an accounting and damages. PDHN alleged that AHP had failed to comply with the Agreements by not allowing 100% of its members access to the Agreements, that such conduct constituted a breach of the Agreements, and that the breach resulted in PDHN suffering loss of access fees in respect of all members and/or subscribers of AHP during the term of the Agreements. PDHN sought an accounting of the AHP membership from September 1, 1996 to the date of the petition and damages in the amount to which PDHN alleged it would otherwise have been entitled under the Agreements.
PDHN was paid $34,133.68 by AHP over the course of the Agreements. PDHN contends the full amount of fees, if properly calculated under the provisions of Paragraph 2.3, should have been $349,000.09. Thus, PDHN sought Ran award of $314,965.32, together with legal interest from November 20,1997 until paid.
In addition, PDHN requested damages for loss of reputation, disruption of busi *1070 ness activities, and other losses associated with the breach, as well as attorney’s fees and costs.
On January 27, 1998 AHP notified PDHN it was terminating the Agreements effective 120 days from that date.
The matter came to trial on January 11-12, 2000. The trial court took the matter under advisement and rendered judgment on May 26, 2000. The court found that AHP did not breach the terms of the Agreements entered into with PDHN and, accordingly, rendered judgment in favor of AHP. In written Reasons for Judgment, the trial court made the following findings and conclusions, in pertinent part:
At trial the testimony was that these were standard form contracts that were prepared by Jim Henderson, owner and president of PDHN. Similar contracts had been previously used by PDHN in other business arrangements with other parties.
[[Image here]]
Louisiana Civil Code Article 2056 and the Courts are clear that in instances where there is a difference of interpretations of standard form contracts, “The contract must be construed against the party who furnished its text.” Therefore the interpretation of the contracts should be weighed in favor of the defendants in that they in no way contracted with the plaintiff to fulfill all those requirements that have been alleged by the plaintiff to have been breached.
[[Image here]]
[T]here were several terms contained in these contracts which the defendant pointed out that they had no intention of fulfilling because such terms would have been impossible to fulfill. The Court also finds that there were in fact certain terms which were impossible to comply with by the defendants....
[sThis Court finds that the terms of these contracts were not only ambiguous, but they also failed to express the clear intent of the parties. Furthermore, there were provisions within these contracts which were not possible to perform and yet remain in compliance with certain insurance regulatory requirements. As a result there was no breach committed by the defendant, Advantage Health Plan, to which the plaintiff, Professional Dental Health Network, is entitled by law to seek damages.
On appeal, PDHN makes the following assignments of error:
1. The trial court erred in failing to enforce the terms of unambiguous contracts.
2. The trial court erred in considering parole evidence to interpret unambiguous contracts.
3. The trial court erred when it found that the agreements were standard form contracts of PDHN wherein they were negotiated agreements between AHP and PDHN.
4. The trial court erred in holding that AHP was excused from its obligations under the three agreements in that AHP had no intention of fulfilling certain obligations under the three agreements.
5. The trial court erred in holding that AHP would have been required to pass the cost of the DVH Rider to its members in violation of regulations of the Louisiana Department of Insurance, which regulations do not exist and which was specifically prohibited by the contracts.
6. The trial court erred in finding that the terms of the three agreements were not only ambiguous but they *1071 also failed to express the clear intent of the parties.
These assignments raise the following issues on appeal: whether the Agreements were ambiguous; whether parole evidence was properly admitted to interpret the Agreements; whether the substance of the Agreements was prohibited | fiby any regulations of the Louisiana Department of Insurance; whether the trial court should have enforced the terms of the Agreements; and whether PDHN is entitled damages and, if so, the amount thereof.
LANGUAGE OF AGREEMENTS
The three Agreements (one each for the dental, vision and hearing networks) are nearly identical; the main difference is the rate schedule for each network, but there are a few differences in language in other portions of the Agreements. The following are the relevant provisions from the dental network Agreement, with notes to indicate differences in the other two Agreements:
This Agreement is entered into as of the 1st day of September, 1996, by and between, ADVANTAGE HEALTH PLAN, INC. (“AHP”) ... and PROFESSIONAL DENTAL HEALTH NETWORK, INC. (“PDHN”)....
WHEREAS, AHP desires to provide to all of its MEMBERS access to PDHN’S [DENTAL] [“VISIONVANTAGE”] [“NATIONAL EAR CARE PLAN” HEARING] NETWORK and associated fee schedule; and
WHEREAS, PDHN desires to grant to AHP the use of its [DENTAL] [VISION] [HEARING] NETWORK and associated fee schedule pursuant to the terms of this Agreement.
[[Image here]]
1. DEFINITIONS
The following terms when used in this Agreement and when capitalized will have the meanings assigned to them below:
(a) “SUBSCRIBER” means an employee or family unit covered as a participant by an AHP PRODUCT.
(b) “MEMBER” is a SUBSCRIBER and/or the covered eligible dependent of a SUBSCRIBER. All MEMBERS shall have access to the [DENTAL] [VISION] [HEARING] NETWORK.
[[Image here]]
|7(e) “PRODUCTS” shall be defined ... to include all products marketed by AHP, including ... Health Maintenance type plans, Point of Service type products, individual HMO products and Medicare Risk business, provided, however, PRODUCTS shall not deem to include any indemnity products offered by AHP.
[[Image here]]
2. USE OF THE PDHN [DENTAL] [VISION] NETWORK
2.1 AHP shall provide PDHN a monthly list of its MEMBERS....
2.2 ... AHP shall be responsible for providing each AHP MEMBER the list of [dentists] [optometrists] [audiologists] participating in the [DENTAL] [VISION] [HEARING] NETWORK....
2.3 AHP will pay PDHN an advance monthly fee, based upon the numbers as reported quarterly to the Louisiana Department of Insurance, starting September 1996 and ending August 1997. The monthly access fee shall be $[.29/. 13/. 13] pmpm until the number of members accessing the [DENTAL] [VISION] [HEARING] NETWORK reaches 10,-000. Then, the monthly access fee shall reduce to $[.25/. 10/. 10] pmpm until the number of members accessing the *1072 [DENTAL] [VISION] [HEARING] NETWORK reaches 25,000. Then, the monthly access fee shall reduce to $[.23/ .07/.05] pmpm until the number of members accessing the [DENTAL] [VISION] [HEARING] NETWORK reaches 50,-000. Then, the monthly access fee shall reduce to $[.21/.05/.04] pmpm until the number of members accessing the [DENTAL/VISION/HEARING] NETWORK reaches 100,000. At that time, the [DENTAL] [VISION] [HEARING] NETWORK access fee shall reduce to $[.20/.04/.03] pmpm. Such payment will be made in advance by the first of each then current month. Such rate shall be in effect for the balance of the initial one (1) year term of this Agreement, and shall be subject to renegotiation upon renewal of this Agreement.
[[Image here]]
3. GRANT OF RIGHTS
PDHN grants the use of its [DENTAL] [VISION] [HEARING] NETWORK and FEE SCHEDULE to AHP for use by AHP’s MEMBERS, as a value added benefit to supplement all of AHP’s PRODUCTS. PDHN does not grant to AHP the right to, and specifically prohibits | pAHP from, marketing or selling PDHN’s [dental/vision/hearing discount fee] for service plan as an option product. All PRODUCTS must be marketed or sold as an inclusive package. This grant is given to AHP for a period of one year, beginning on September 1, 1996, so long as this Agreement is in force and all fees due hereunder are paid.
* * *
13. AMENDMENT OR MODIFICATION
This Agreement may not be amended or modified except in writing signed by authorized representatives of both parties.
* * *
18. ENTIRE AGREEMENT
This Agreement and all Exhibits hereto contain the entire agreement between the parties relating to the subject matter herein and all prior proposals, discussions, and writings by and between the parties and relating to the subject matter herein are superseded hereby. None of the terms of this Agreement shall be deemed to be amended unless such amendment is in writing and signed by both parties, and recites specifically that it is an amendment to the terms of this Agreement.... [Emphasis added.]
Although the three Agreements are superficially the same, there are discrepancies among them. In the Hearing Agreement Section 2 is titled, “Use of the PDHN Dental Network” (emphasis added) although clearly it should have been called “Use of the PDHN Hearing Network.”
In the Vision Agreement the first sentence states, “AHP will pay PDHN an advance monthly access fee, based upon the member numbers as reported quarterly to the Louisiana Department of Insurance, starting September 1996 and ending August 1997.” (Emphasis added.) Thus, the Vision Agreement contains verbiage not in the Dental Agreement.
On the other hand, the Hearing Agreement contains less verbiage: the first sentence states, “AHP will pay PDHN an advance monthly fee starting September 1996 and ending August 1997,” and the next sentence continues to “The monthly 19access fee shall be.... ” The remainder of the paragraph sets out the sliding scale for the Hearing Network. Thus, the Hearing *1073 Agreement omits mention of “access” in the first sentence and also omits reference to “the member numbers ... reported quarterly to the Louisiana Department of Insurance.”
LAW AND ANALYSIS
To interpret a contract, a court must determine the common intent of the parties. La. C.C. Art. 2045. If the words of a contract are clear, explicit, and lead to no absurd consequences, the court may make no further interpretation in search of the parties’ intent. La. C.C. Art. 2046.
The court must give the words of a contract their generally prevailing meaning. La. C.C. Art. 2047. Words subject to different meanings must be interpreted with the meaning that best conforms to the object of the contract. La. C.C. Art. 2048. A provision that may have different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. C.C. Art. 2049.
Each provision must be interpreted in light of the other provisions, so that each is given the meaning suggested by the contract as a whole. La. C.C. Art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. Art. 2053. Where there is doubt that otherwise cannot be resolved, a provision in a contract must be interpreted against the party who furnished its text; in case of doubt, a contract executed in a standard form of one party must be interpreted in favor of the other party. La. C.C. Art. 2056.
1^Extrinsic evidence, including testimony, may not be admitted to negate or vary the contents of an authentic act or an act under private signature. La. C.C. Art. 1848. “Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement.” Id.
At issue is whether, under the three Agreements, AHP was allowed to limit the number of members it reported to PDHN and for which it paid access fees, or was required to pay PDHN based upon the total number of its members reported to the state insurance department.
PDHN contends the Agreements clearly state that all members of AHP were to be included in the rate computations.
AHP argues that several provisions of the Agreements are ambiguous. First, AHP contends that the definition of “member” in Paragraph 1(b) is unclear because it does not specify whether it refers to members of AHP or members of PDHN. AHP asserts that Paragraph 2.1 is ambiguous because it uses the term “members” and refers back to the definition of Paragraph 1(b).
AHP also argues that Paragraph 2.8, which PDHN asserts provides for access to its networks by 100% of AHP members, is only contained in two of the three Agreements, because the phrase “based upon the member numbers as reported quarterly to the Louisiana Department of Insurance” was omitted from the Hearing Agreement. AHP argues further that the actual payment provision begins in the second through fifth sentences of Paragraph 2.3, which set out a sliding scale payment provision according to “the number of members accessing” the networks.
|nIn addition, AHP asserts that PDHN’S interpretation of Paragraph 3.0 is incorrect and, instead, that Paragraph 3.0 “prevented AHP from ... selling the PDHN product as a separate product independent of its benefit plans .... as a *1074 stand-alone product.” AHP argues that the two varying interpretations of that Paragraph establish its ambiguity.
We find that “member” is not ambiguous, because “member” is defined as “a subscriber” and “subscriber” is defined in Paragraph 1(a) as “an employee or family unit covered as a participant by an AHP product.”
We do find other phrases that produce ambiguity, however.
The Agreements each state in Section 1(b) that “All MEMBERS shall have access to the ... NETWORK.” The subsequent use of “access” and its variant forms, however, makes this confusing.
The payments set out in Paragraph 2.8 require AHP to pay PDHN a monthly fee. The language varies, however, in describing the fee:
a. The Dental Agreement states, “AHP will pay PDHN an advance monthly fee based upon the numbers as reported quarterly to the Louisiana Department of Insurance, starting September 1996 and ending August 1997.” (Emphasis added.)
b. The Vision Agreement states, “AHP will pay PDHN an advance monthly access fee based upon the member numbers as reported quarterly to the Louisiana Department of Insurance, starting September 1996 and ending August 1997.” (Emphasis added.)
c. The Hearing Agreement states, “AHP will pay PDHN an advance monthly fee starting September 1996 and ending August 1997.”
112The Dental and Hearing Agreements refer to the fee as an “advance monthly fee,” while the Vision Agreement calls it an “advance monthly access fee.” All three agreements set out a sliding scale for the monthly fees based on “the number of members accessing” each network. (Emphasis added.)
Webster’s Ninth New Collegiate Dictionary (1989) at 49 defines “access” as both a noun and a verb. The definition applicable here, in the noun form, is “freedom or ability to obtain or make use of’; in the verb form, “to get at: gain access to.”
Reviewing the use of the term “accessing” in the Agreements, we find the meaning is ambiguous. PDHN argues that because each of the Agreements states in Section 1 that “[a]ll MEMBERS shall have access to the ... NETWORK,” the sliding scale provisions in Section 2, Paragraph 2.3, which base the fee scale on “the number of members accessing” each network, apply to all members of AHP.
AHP argues, however, that the phrase “number of members accessing” referred only to those members who chose and paid for access to PDHN’s networks.
In the Vision Agreement the phrase “member numbers” in Paragraph 2.3 implies that the fee is based on the number of members (“subscribers”) who are participants in AHP and states that the “advance monthly access fee” is based on the number of members — or subscribers — in AHP. In the Dental Agreement, however, the phrase is merely “numbers reported” to the department of insurance.
That sentence, however, is followed by the series of sentences that set out the sliding scale payments. Each of those sentences contains the limiting phrase, “the number of members accessing the ... network.” That phrase seems to 113contemplate something less than the total number of subscribers in AHP. It could, as argued by AHP, contemplate either the number of members who actually use the services of PDHN or the number of members who have the right to use *1075 PDHN. It implies a limitation of the number of members, rather than application to all members. Thus, the term “accessing” as used in Paragraph 2.3 is ambiguous.
In addition, the wording to which we refer was supplied by PDHN. Accordingly, it must be construed against the party who furnished its text. La. C.C. Art. 2056.
Due to the ambiguities, the trial court did not err in admitting extrinsic evidence to interpret the meaning of the Agreements.
At trial Jim Henderson, owner of PDHN, testified that he discussed membership access with AHP’s representative and was told that AHP would be bringing in groups only at their first annual renewal with AHP, so that AHP could build in the cost of the PDHN plans into its renewal contracts. He also stated that even after AHP notified PDHN it was terminating the arrangement, PDHN continued to allow AHP members access to the network services. He acknowledged that he prepared the contracts and said he adjusted the language according to input from AHP.
He identified a letter from PDHN to AHP, dated November 25, 1996, which stated:
Shortly afterwards [after AHP and PDHN entered into the agreements] [AHP] decided to hold the offering until each group’s 1996 annual renewal with a member pass-through of your pmpm cost for access to our networks. Later, it was discovered that most renewals were not until 1997 or later due to the presence of many two year rate guarantees. We agreed to continue our agreement under these modified conditions.
| uThat letter was signed by Jim Henderson as Managed Care Director for PDHN and also by Stanley Plenderson, President of PDHN.
Jim Henderson also identified a letter he wrote to AHP dated February 10,1997, which acknowledged AHP’s decision “to hold the member access offering until each group’s next annual renewal” and that AHP later discovered that many renewals were not be due until 1997 or later due to two-year rate guarantees in some plans.
In addition he identified a letter from PDHN to AHP dated May 23, 1997, in which PDHN demanded that AHP either “pay ... the full amount due from September 1, 1996 through June 1, 1997 based upon section 2.2” of the agreements, continuing “proper payments” through August 1, 1997 or, alternatively, that AHP “provide and pay the access fees ... for 100%” of AHP’s membership base from July 1, 1997 through June 30,1998.
Further, Henderson admitted that in drafting the Agreements, he inadvertently omitted from Section 2.3 of the Hearing Agreement the provision regarding Department of Insurance figures. He stated that one of the reasons for the Department of Insurance provision was for audit purposes.
Drew Joyce, a former AHP vice president of finance and chief financial officer, testified for the defense. He was employed at AHP from July 1996 until April 1999. He understood that the PDHN product would be bundled with the health plan, but as a separate provision, added as augmentation to their benefit plan. It was never his understanding that AHP would pay an access fee for all its members, because the PDHN product was not universally purchased by all AHP’s members. Rather, AHP had other dental plan provisions being offered by |]5employers; in fact, even AHP’s own employees were covered by another dental discount program.
Joyce pointed out that augmentation of benefits impacts plan pricing. He said that *1076 most groups renew their coverage in January, except for state agencies, which renew in July. However, every month there are groups renewing. Joyce also stated that Henderson himself brought to their attention that there are statutory limitations on dental offerings by HMOs. They are not allowed to bundle dental care in with other health benefits.
Joyce testified that he was not part of the negotiations for these contracts because he had just started working for AHP in July 1996. He stated that AHP did not market any optional products; everything had to be part of the program of medical benefits offered, including mental health, drug, and vision benefits. However, every employer could choose what benefits it wanted in its program; an HMO cannot force its client to take a given set of benefits.
Renee Thomas testified she was employed by AHP from September 1995 until August 1998 as Network Development Coordinator. It was part of her job to negotiate contracts with health care providers and she negotiated these contracts with PDHN, starting in May 1996. She stated that in June 1996 PDHN apparently was under the impression that AHP was going to use its total membership in the PDHN networks. She said that was cleared up later in the negotiations. She identified a faxed memo directed to her from PDHN, dated 7/11/96, that acknowledged that the benefit would be offered on a month-by-month basis as contract renewals took place, rather than 100% of the membership immediately.
11fiThomas testified she had discussions with Jim Henderson by fax, telephone and letters. She stated he agreed to the month-by-month “rollout” and that they would offer the PDHN benefit to employer groups upon renewal instead of the entire membership on September 1,1996.
We conclude the conduct of the parties after the Agreements were executed supports AHP’s interpretation of the Agreements. PDHN not only acquiesced in AHP’s administration of the Agreements, which included payments for far fewer members than PDHN now claims were due, but also continued the relationship by renewing the Agreements for an additional term.
In his reasons for judgment the trial judge found that AHP “would have been required, under the contracts, to pass along the cost of those products to its insured [sic] without giving those insured persons or employers the ability to elect such coverage.” The judge found, “This would have been a clear violation of Louisiana Department of Insurance Regulation.”
On appeal PDHN contends the trial court erred in that ruling and that neither AHP nor the trial court could cite any law, regulation or rule that would prohibit operation of the contracts as PDHN asserts they should be handled.
At trial, however, AHP placed in evidence, without objection from PDHN, a copy of a fax from Jim Henderson to Lester Dunlap of the Louisiana Department of Insurance, dated February 10, 1997. In that message Henderson reminded Dunlap that he and Dunlap had had “several conversations regarding the legality” of HMOs “offering their members free access to discount dental fee-for-service networks.” Henderson stated,
It was the opinion of the DOI that the HMO act prohibits HMO’s [sic] from offering network access and passing |17the cost to its members, unless the HMO specifically noted the pmpm access fee on the premium billing and give [sic] the subscriber or member the right to refuse and to lower their premium.
*1077 AHP also placed in evidence a response letter from Dunlap to Henderson, dated February 17, 1997, advising that the Department of Insurance “is examining arrangements that exist between health maintenance organizations and dental referral plans in order to assure their compliance with Louisiana insurance law.”
These documents make clear that there were questions regarding the legality of PDHN’s dental network proposal. They do not, however, provide clear evidence that it was illegal.
On cross examination Jim Henderson testified that after the AHP contract was signed, he “came across the knowledge that the Department of Insurance says they have a policy to ask HMO’s to give the right of refusal to members on a discount plan.” He called AHP and told them about “this unwritten policy.”
La. R.S. 22:2002 defines “health care services” as follows:
(6) “Health care services” means any services rendered by providers which include but are not limited to medical and surgical care; psychological, opto-metric, optic, chiropractic, podiatric, nursing, and pharmaceutical services; health education, rehabilitative, and home health services; physical therapy; inpatient and outpatient hospital services; dietary and nutritional services; laboratory and ambulance services; and any other services for the purpose of preventing, alleviating, curing, or healing human illness, injury, or physical disability. Health care services shall also mean dental care, limited to oral and maxillofacial surgery as ■performed by board qualified oral and maxillofacial surgeons. [Emphasis added.]
That definition is important in connection with the definition of a health maintenance organization that follows in the statute:
liS(7) “Health maintenance organization” means any corporation organized and domiciled in this state which undertakes to provide or arrange for the provision of basic health care services to enrollees in return for a prepaid charge. The health maintenance organization may also provide or arrange for the provision of other health care services to enrollees on a prepayment or other financial basis. [Emphasis added.]
Relying on these definitions in the statutes governing HMOs, it appears questionable whether an HMO can in fact offer any dental services other than oral and maxil-lofacial surgery performed by board qualified oral and maxillofacial surgeons. There is no such limitation, however, on HMOs offering vision and hearing services. Accordingly, the trial court did not err in the ruling insofar as it affected the Dental Agreement.
Considering that PDHN acquiesced in AHP’s interpretation of the agreements, we find that PDHN is not entitled to recover damages under these Agreements. The trial court’s ruling is correct and must be affirmed.
DECREE
For the foregoing reasons, the judgment of the district court is affirmed. Costs of this appeal are assessed against appellant, Professional Dental Health Network, Inc.

AFFIRMED.